**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KS StateBank Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Kathleen K. Peters, et al.,<br><br>Defendants. | No. CV-25-02576-PHX-ROS<br><br>**ORDER** |

Pursuant to this Court's order dated September 16, 2025, (Doc. 13), on October 1, 2025, Plaintiff KS StateBank Corporation filed a Renewed Application for the Appointment of a Receiver (Doc. 15, "Application"). Defendants Kathleen K. Peters and Gerald P. Peters III responded on October 8, 2025, (Doc. 16), joined by Defendants Joseph Thompson and Donald A. Gonzales in their capacity as trustees[1] (collectively, the "Additional Pledgors")[2] (Doc. 17). Plaintiff replied on October 17, 2025. (Doc. 20.)

On November 17, 2025, the Court ordered Defendants to show cause why a receiver should not be appointed in light of Defendants' express authorization to such appointment. (Doc. 21.) An evidentiary hearing was held on November 25, 2025, at the conclusion of which the Court granted Plaintiff's Application and directed the parties to file a proposed order governing the receivership in one week. The reasons for the ruling follow.

---

[1] Defendant Thompson acts as trustee for the Soren G. Peters 2012 Trust, the Devin B.A. Peters 2012 Trust, and the Krista N.A. Peters 2012 Trust. (Doc. 1 ¶ 3.) Defendant Gonzales acts as trustee for the Erica B. Peters 2012 Trust. (*Id.* ¶ 4.)
[2] General references to "Defendants" include both the Additional Pledgors and Mr. and Mrs. Peters.

## I. BACKGROUND

From 2019 to 2024, Plaintiff KS StateBank Corporation, a Kansas banking corporation, executed a series of agreements (collectively, "Loan Documents") extending and securing two loans (collectively, "Loans") totaling $37 million[3] to Defendants. Defendant Gerald Peters III is an alleged real estate investor, business entrepreneur, and art dealer based in Sante Fe, New Mexico, and the controlling shareholder and former chairman of Century Financial Services Corporation ("CFS"), a bank holding company ("BHC")[4] headquartered in Santa Fe. (Doc. 16 at 1–2.) CFS controls Century Bank, an FDIC-insured bank also headquartered in Santa Fe. (*Id.* at 1.)

On July 19, 2019, Plaintiff and Defendants signed a Loan Agreement (collectively with subsequent modifications,[5] "Loan Agreement") detailing the terms for repayment of the Loans alongside two Collateral Assignment, Equity Pledge and Security Agreements (collectively, "Security Agreements"). (Doc. 1-1 at 3–4.) In the Security Agreements, Defendants pledged their collective shares of stock in CFS ("Shares")—the Peterses' 44% stake as collateral for both Loans, and the Additional Pledgors' 27% stake as collateral for only the larger loan of $24,280,000. (Doc. 16 at 4–5.)

On February 27, 2025, Plaintiff's counsel sent a letter notifying Defendants of an alleged missed interest payment on January 19, 2025, which would constitute an Event of

---

[3] The smaller of the Loans was for $12,720,000; the larger of the Loans, originally for $17,280,000, was later increased to $24,280,000 by the First Modification Agreement dated December 22, 2020. (Doc. 1-1 at 100.). In its Application, Plaintiff alleges the Loans "totaled $35,000,000 in principal," equal to the unpaid principal balance as of the filing date. (Doc. 15 at 1–2.) But letters from Plaintiff's counsel instead describing the combined maximum principal as $37,000,000 seem to confirm the Court's calculation, (Doc. 1-1 at 242, 247), so it is possible $35,000,000 is simply the unpaid principal balance.

[4] A bank holding company is "any company which has control over any bank . . . or bank holding company." 12 U.S.C. § 1841(a)(1). A company has "control" if it "directly or indirectly" controls 25% of a bank's or BHC's voting securities, "controls in any manner the election of a majority of the directors or trustees of the bank or [BHC]," or upon determination of the Board of Governors of the Federal Reserve "that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or [BHC]." *Id.* § 1841(2).

[5] Subsequent modifications include: the First Modification Agreement increasing amount of the larger loan from $17,280,000 to $24,280,000 (Doc. 1-1 at 100); the Second Modification Agreement extending the maturity date to May 27, 2025 (*id.* at 113); and the Loan Modification Agreement and Waiver of Default giving Defendants an opportunity to cure a missed quarterly interest payment and a covenant breached by a reduction in the Shares' value (*id.* at 121).

Default under the Loan Documents if not cured within 30 days.[6] (Doc. 1-1 at 242–44.) The Loans matured and were due in full on May 27, 2025. (Doc. 1-1 at 113.) Defendants failed to repay the Loans by this date, and on June 3, 2025, Plaintiff's counsel sent another letter notifying Defendants of their maturity default and failure to cure the violations noted in the February 27 letter. (*Id.* at 249.)

On June 18, 2025, Plaintiff filed a Verified Complaint in Maricopa County Superior Court for breach of contract against Defendants, along with an *Ex Parte* Application requesting a receiver be appointed to manage and take control of the Shares. (*Id.* at 11–16, 55–63.) The superior court scheduled an expedited hearing for June 24, 2025, ordering Defendants to show cause why a receiver should not be appointed. (*Id.* at 6–8.) At the hearing, the judge reassigned the case to commercial court, and another hearing was scheduled for July 25, 2025. (*Id.* at 273.) But on July 21, 2025, Defendants filed a Notice of Removal with this Court, (Doc. 1), and thereafter filed their Answers (Docs. 6, 8). Plaintiff then filed its Renewed Application for the Appointment of a Receiver. (Doc. 15.) In their Response, (Doc. 16), Defendants contest the appointment of a receiver; or alternatively, if a receiver is appointed, Defendants object to Plaintiff's proposed receiver, the scope of the receiver's proposed duties and rights, and request the Court to require a bond be posted.

Prior to the November 25 evidentiary hearing, the parties filed a Joint Pre-Hearing Statement in which Defendants alternatively propose, should the Court grant a receiver, that Eric Corrigan of MJC Partners be appointed given his "extensive experience with regulated bank transactions." (Doc. 22 at 11.) Mr. Corrigan is currently retained by Mr. and Mrs. Peters to "negotiate a loan on behalf of the Peters [sic] that is secured by the Shares and is sufficient to resolve the Peters' obligations to KS." (Doc. 23 at 4.)[7]

---

[6] The February 27 letter also set forth 10 other violations of the Loan Agreement that would allegedly constitute an Event of Default. (Doc. 1-1 at 244.)

[7] Based on his testimony at the November 25 hearing, Mr. Corrigan has also been retained and authorized by CFS's board of directors to market and sell the *entirety* of CFS, not just the disputed Shares. It is unclear how his competing duties to Mr. Peters and to CFS were to be resolved—Mr. Peters seeks to use the Shares as collateral on another loan to pay off the debt to Plaintiff; CFS seeks to sell 100% of its stock (including the Shares), and Mr. Peters would then use his sale proceeds to pay off the debt to Plaintiff. But these goals are

- 3 -

## II. LEGAL STANDARD

Under Rule 66 of the Federal Rules of Civil Procedure, federal law and federal equitable principles govern the appointment of a receiver in diversity actions. *Can. Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009); *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993). Appointing a receiver under federal law "'is an extraordinary equitable remedy,' which should be applied with caution." *Can. Life*, 563 F.3d at 844 (quoting *Aviation Supply*, 999 F.2d at 316). Because Rule 66 provides "no precise formula for determining when a receiver may be appointed," *Aviation Supply*, 999 F.2d at 316, district courts have "broad discretion" and "may consider a host of relevant factors" including:

> (1) "whether [the party] seeking the appointment has a valid claim";
> (2) "whether there is fraudulent conduct or the probability of fraudulent conduct," by the defendant;
> (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squandered";
> (4) whether legal remedies are inadequate;
> (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment;
> (6) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and,
> (7) "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership."

*Can. Life*, 563 F.3d at 844–45 (first quoting 13 *Moore's Federal Practice*, § 66.04[2][b] (3d ed. 2008); and then quoting *N.Y. Life Ins. Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991)). No one factor under *Canada Life* is dispositive, and courts may consider other circumstances beyond these enumerated factors. *Id.* at 845. One factor entitled to "great weight" in favor of appointment is an agreement between parties expressly authorizing the appointment of a receiver. *E.g.*, *N.Y. Life Ins.*, 755 F. Supp. at 292; *HFC Acceptance, LLC v. AEZ Rent A Car LLC*, No. CV 23-7744-GW-AGRX, 2023

---

mutually exclusive, as Mr. Peters cannot retain his stake if 100% of CFS is sold. And it appears Mr. Peters and CFS may have no right to sell the Shares on their own now that Plaintiff's rights attached following Defendants' undisputed default.

WL 11950398, at *3 (C.D. Cal. Nov. 15, 2023); *see also D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008) (shifting the burden to the opposing party to demonstrate why a receiver should not be appointed in spite of their prior authorization).

## III. ANALYSIS

### A. *Canada Life* Factors

#### 1. Valid Claim

It is undisputed that Plaintiff has a valid claim against Defendants for ownership of the Shares.[8] In their Answer, Defendants admit Plaintiff made two loans to Defendants for $35,000,000, (Doc. 6 ¶ 13), Defendants promised to repay the Loans, (*id.* ¶ 14), Defendants granted Plaintiff a security interest in the Shares as collateral, (*id.* ¶ 20), the loans matured and were payable in full on or about May 27, 2025, (*id.* ¶ 26), and Defendants have not yet repaid the loans (*id.* ¶¶ 15, 34). Because the Loans are in default, it appears undisputed Plaintiff has a valid claim as a secured party with a legally recognized right in the Shares. *See Paradise v. USPLabs, LLC*, No. SA CV 16-0200-DOC, 2016 WL 11505594 (C.D. Cal. Apr. 11, 2016) (noting a party seeking appointment of a receiver must show some legally recognized right in the property "amount[ing] to more than a mere claim against the defendant" (quoting *Manuel v. Gembala*, No. 7:10-CV-4-FL, 2010 WL 3860407 (E.D.N.C. Sept. 30, 2010))).

Nevertheless, Defendants argue this factor weighs against appointing a receiver because "Plaintiff does not assert claims against non-parties CFS or Century Bank, the entities that Plaintiff seeks to control through a general receivership." (Doc. 16 at 11.) But this factor concerns whether Plaintiff has a valid claim against Defendants for the Shares; it is irrelevant whether Plaintiff also has a claim against the entities subject to the control of Shares' holder. What is more, CFS expressly consented to the relevant transactions.

---

[8] The Court interprets Defendants' assertion that "Plaintiff has a claim for money damages against Peters *only*," (Doc. 16 at 11), to mean that Plaintiff has a claim against all Defendants but not against CFS or Century Bank. Defendants also note that the Peterses' shares secured both Loans, while the Additional Pledgors' shares only secured the larger loan. (*Id.* at 4.) Nevertheless, Plaintiff alleges Defendants defaulted on both Loans.

- 5 -

Thus, this factor weighs in favor of appointing a receiver.

### 2. Probability of Fraudulent Conduct

Plaintiff argues this factor weighs in favor of appointing a receiver because "Gerald Peters is the subject of multiple lawsuits . . . related to the non-payment of debts, so the likelihood of fraud is high." (Doc. 15 at 10.) Defendants contend "Plaintiff's allegation that Peters faces additional claims for 'non-payment of debts' is not suggestive of fraudulent conduct." (Doc. 16 at 12.)

This factor does not require actual fraud be established, and non-fraudulent conduct can give rise to an inference of fraud. *See Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 981 (8th Cir. 2020) (finding receiver may be appropriate to protect judgment creditor's interest in debtor's property when debtor has shown intention to frustrate attempts to collect judgment). But Defendants' alleged breach of other loan agreements, unless seemingly fraudulent, does not alone risk fraudulent conduct here. *See Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, No. CV 11-01539 MMM, 2011 WL 13220305, at *26 (C.D. Cal. June 29, 2011) ("The fact that [a defendant] may have breached the contract, however, does not prove it engaged in fraud. To conclude otherwise would convert all contract claims into tort claims."); *see also id.* (suggesting doubts over a defendant's financial standing are better considered under the third factor regarding imminent danger to the property (citing *Regions Bank v. R&D Development Corp.*, Civil No. 10-759-GPM, 2011 WL 2149086, at *4 (S.D. Ill. May 31, 2011))). In the absence of specific facts supporting an inference of fraud, this factor is neutral.

### 3. Imminent Danger to Property

Plaintiff argues the Shares are in imminent danger because "Peters remains in voting control" and "has the ability to diminish the value of the [Shares]." (Doc. 15 at 10.) Defendants urge the Court to reject Plaintiff's "unspoken inferences that Peters would in fact attempt or is incentivized to diminish the value of the collateral," (Doc. 16 at 13), noting Plaintiff merely speculates about future value yet admits "[t]he anticipated value of

- 6 -

CFS is sufficient to pay of Plaintiff" (Doc. 1-1 at 61).[9] Also, Defendants suggest a receiver without experience in BHCs poses a greater danger to the Shares, and thus to CFS and Century Bank, in contrast to Mr. Peters's "longtime, expert guiding hand." (Doc. 16 at 13.)

Without more, the Court cannot conclude there is imminent risk to the Shares and CFS—whether by concealment, waste, or diminished value—merely because Mr. Peters remains in voting control with capacity to diminish their value. However, the Court also does not find Mr. Peters's sole control of the Shares inherently poses less risk to their value than control by a neutral officer of the court with the requisite expertise.[10] *See Fed. Home Loan Mortg. Corp. v. Tsinos*, 854 F. Supp. 113, 115 (E.D.N.Y. 1994) (noting a receiver is an "arm of the court," not the plaintiff's agent). Given the unique nature of this collateral, the value of the Shares could be affected not only by the controlling shareholder's conduct but by public perception of the controlling shareholder and his role at CFS. Public knowledge of Mr. Peters's recent outstanding or defaulted obligations[11] belies Defendants' suggestion that a neutral receiver with expertise and subject to the Court's oversight and control would be perceived as riskier than Mr. Peters. *See Signal Hill Serv.*, 2011 WL 13220305, at *26; *Rio Verde Plantas, LLC v. O&S Holdings, LLC*, No. 3:25-cv-00098-JR, 2025 WL 1368639, at *5 (D. Or. Mar. 21, 2025) (finding a defendant's "fraught financial state" was sufficient to show imminent danger).

---

[9] Elsewhere in their Response, Defendants note federal regulations "prevent Peters from selling the shares absent prior approval [from the Federal Reserve] and mitigate any risk that Peters will dispose of the property during the pendency of the matter, further weighing against the appointment of a receiver." (Doc. 16 at 9 n.5.) The Court considers this argument applicable to whether the property is at imminent risk.

[10] Defendants' concerns regarding the receiver's expertise are readily addressed by Mr. Corrigan's apparent willingness to assist the receiver.

[11] The Court notes referenced news reports detailing multiple recent lawsuits against Mr. Peters for unpaid debts and threatened foreclosures on his properties. *E.g.*, Phaedra Haywood, *Another Creditor Files Suit Against Gerald Peters, Family, Businesses*, Santa Fe New Mexican (Feb. 22, 2025), https://www.pressreader.com/usa/santa-fe-new-mexican/20250222/281724095284864; Phaedra Haywood, *Real Estate Mogul Peters, Wife Fight to Halt Auction of Pecos-Area Fly Fishing Ranch*, Santa Fe New Mexican (Nov. 14, 2025), https://www.santafenewmexican.com/news/local_news/real-estate-mogul-peters-wife-fight-to-halt-auction-of-pecos-area-fly-fishing-ranch/article_38c24380-b03b-4f4c-97e3-0ff166ca3b77.html. Further, in 2024 Mr. Peters unsuccessfully defended against a personal injury suit from a woman injured at one of his properties, resulting in a judgment of $31 million for the plaintiff. Phaedra Haywood, *Jury Awards $31 Million in Fall Outside Maria's Restaurant*, Santa Fe New Mexican (Apr. 11, 2024), https://www.yahoo.com/news/jury-awards-31-million-fall-033300381.html.

Because Plaintiff has not shown imminent risk to the Shares and it is undisputed the value of the Shares is sufficient to pay off Defendants' debt, this factor does not weigh strongly in favor of granting a receivership. But Defendants' assurances of CFS's financial health, (Doc. 16 at 15), are contradicted by Defendants' 2024 admission to breaching the Loan Agreement provision requiring the Shares maintain at least 60% of their value as originally pledged (Doc. 1-1 at 121). And it is Defendants' financial health, not CFS's, that is relevant.[12] Further, it appears news outlets have not yet reported on this litigation in which Defendants allegedly defaulted on the Loans for $37,000,000—significantly greater than previously reported defaults—that was collateralized by the Shares.[13] Any negative news coverage may not affect the value of the Shares, but appointing a receiver while this dispute is pending would mitigate any current or future devaluation related to public and market perception of Mr. Peters as CFS's controlling shareholder. Overall, this factor weighs slightly in favor of granting a receivership.

### 4. Inadequacy of Legal Remedies

Plaintiff asserts "[n]o other legal remedies will work." (Doc. 15 at 10.) Specifically, Plaintiff believes "a UCC foreclosure sale . . . [is] the most appropriate alternative remedy, but Peters objects." (*Id.*) Defendants contend "Plaintiff's breach of contract claim suggests that compensatory damages provide an adequate remedy."[14] (Doc. 16 at 14.)

---

[12] While not clearly relevant here, the Court notes the First Modification Agreement increasing the principal by $7,000,000 was collateralized by certificates referred to as the "Cow Creek Stock Collateral." (Doc. 1-1 at 101.) Just two weeks ago, Mr. and Mrs. Peters, as well as Cow Creek Ranch Club LLC, filed suit in New Mexico state court seeking to halt a trustee's sale of Cow Creek Ranch, a fly-fishing resort owned by Peters. Phaedra Haywood, *Real Estate Mogul Peters, Wife Fight to Halt Auction of Pecos-Area Fly Fishing Ranch*, Santa Fe New Mexican (Nov. 14, 2025), https://www.santafenewmexican.com/news/local_news/real-estate-mogul-peters-wife-fight-to-halt-auction-of-pecos-area-fly-fishing-ranch/article_38c24380-b03b-4f4c-97e3-0ff166ca3b77.html; *see Cow Creek Ranch Club LLC v. AgAmerica Lending LLC*, No. D-725-CV-202500223 (N.M. Dist. Ct. Nov. 12, 2025). Plaintiff has not sought to sell the Cow Creek Stock Collateral; but presuming this collateral is stock in Cow Creek Ranch Club LLC, the pending trustee's sale raises questions regarding Defendants' financial health and the sufficiency of the collateral securing the Loans.

[13] Notably, the Loans were to be used, in part, to pay off another outstanding loan to Defendants that was also collateralized by the Shares. (Doc. 1-1 at 141, 188.)

[14] Defendants further argue Plaintiff could alternatively seek replevin or move to attach the Shares. (Doc. 16 at 14 & n.8.) Because neither replevin nor attachment are legal remedies, this argument is irrelevant.

A nonrecourse loan limiting a lender's recovery to the collateral generally renders legal remedies inadequate. *See U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of Wells Fargo Com. Mortg. Sec., Inc., Multifamily Mortg. Pass-Through Certificates, Series 2019-SB63 v. 1078 Whillmore LLC*, 740 F. Supp. 3d 157, 177–78 (E.D.N.Y. 2024). Here, Section 5.2(d) of the Security Agreements reserved Plaintiff's right to alternatively recover damages from Defendants, (Doc. 1-1 at 153, 200), and Plaintiff requests damages be awarded for its breach of contract claim (*id.* at 6). But significantly, in the Loan Agreement Defendants expressly agreed in the event of default "no remedy of law will provide adequate relief" to Plaintiff. (*Id.* at 91.) The limited set of facts offered on this factor renders it neutral.[15]

### 5. Balance of Harms

Plaintiffs argue "[n]o conceivable harm will befall Defendants" by appointing a receiver. (Doc. 15 at 10.) Defendants object, suggesting they will be harmed because the Shares' value will likely diminish if CFS and Century Bank are placed under a receiver's control.[16] (Doc. 16 at 15.)

If the Court appoints a receiver, Defendants will lose control over CFS and Century Bank. Indeed, given his history with CFS and Century Bank, Mr. Peters is likely very familiar with managing the companies' operations. But Defendants' "voluntary accession to a receivership remedy in the bargaining process" suggests "a significant diminution of

---

[15] The parties consented in the Loan Documents to the appointment of a receiver upon default. The parties' express consent to this specific equitable remedy, along with the provision that no legal remedies are adequate, may suggest less weight should be afforded to this factor overall.

[16] At the November 25 hearing, Mr. Corrigan testified for the Defendants that, in his opinion, a receiver's sale of the Shares is undesirable as (1) buyers may be more interested in purchasing 100% of CFS, rather than the 71% via the Shares, thus increasing the competitiveness of the sale price; and (2) some buyers would be turned away upon learning of the receivership, thus driving down the Shares' value. As to the first contention, Mr. Corrigan's retention by CFS to market 100% of CFS's stock is not relevant. Perhaps buyers would pay a higher price per share to secure 100% of a company's stock, but any attempt to sell CFS in its entirety does not affect Plaintiff's undisputed rights to their collateral. The Court finds this opinion sincere but speculative, hypothetical, and not supported by admissible evidence. Also, Defendants and Mr. Corrigan have not established any prospective buyers expressed concerns with purchasing less than 100% of CFS's stock or purchasing the Shares from a receiver. Indeed, CFS knowingly and voluntarily accepted any risk to CFS's value posed by Peters's use of the Shares as collateral for the Loans. (*See* Doc. 1-1 at 229.)

[Defendants'] interest." *Kairos Credit Strategies Operating P'ship v. Friars Nat'l Ass'n*, No. 23-CV-2960 (JPO), 2023 WL 3675921, at *3 (S.D.N.Y. May 26, 2023); *see N.Y. Life Ins.*, 755 F. Supp. at 293 ("There is little hardship in enforcing the terms of the parties' bargain."). And as noted, it is speculative whether the Shares would retain more value under Mr. Peters than under an experienced receiver, particularly in light of Mr. Peters's recent financial troubles and Defendants' alleged failure to maintain the loan-to-value ratio above 60%. (Doc. 1-1 at 121.)

Finally, a receiver may enhance Defendants' position compared to Plaintiff's proposed UCC sale. Defendants admit a UCC sale is an option available to Plaintiff, but Defendants have specifically objected to the sale based on the approximately $40 million credit bid Plaintiff intended to offer for the Shares that Defendants believe are "worth no less than $94,000,000 and as much as $134,616,000." (Doc. 16 at 7.) Assuming arguendo that Plaintiff's credit bid would prevail, Defendants' only recourse would be to challenge the sale in court, where Defendants would bear the burden of showing the sale price rendered the sale commercially unreasonable. In the absence of other commercially unreasonable circumstances, this sale price alone may be insufficient to set aside the sale. *See* A.R.S. § 47-9627(A) ("The fact that a greater amount could have been obtained by a collection, enforcement, disposition or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition or acceptance was made in a commercially reasonable manner."). But in any event, "commercial reasonableness" is not a particularly high bar to meet; if a receiver is appointed, the Court's control over any sale of the Shares will better protect Defendants' interests. Any harm posed to Defendants' interests by a receiver is thus offset by Defendants' voluntary accession and the benefits relative to Plaintiff's alternative recourse. This factor weighs in favor of appointing a receiver.

**6. Plaintiff's Probability of Success and Possibility of Irreparable Injury**

Plaintiff argues it "is guaranteed success on the merits given the maturity of

Defendants' defaults on the Loans." (Doc. 15 at 10.) Defendants do not dispute Plaintiff's probability of success but assert there is no risk of irreparable injury as "CFS and Century Bank are going concerns with stable finances" and the Shares "cannot be sold absent sixty-day notice and regulatory approval." (Doc. 16 at 15.)

Even at this early stage, Plaintiff's success on the merits appears all but guaranteed. Significantly, it is undisputed Defendants defaulted on the Loans collateralized by the Shares; and Defendants' have not offered a conceivable legal theory to overcome Plaintiff prevailing on its claim.

The possibility of irreparable injury to Plaintiff's interest in the Shares is again hypothetical. Perhaps, as Defendants argue, any disposition of the Shares by Defendants requires notice and approval,[17] but the regulatory framework would conceivably reduce the risk that Defendants will sell the Shares while Plaintiff's suit is pending. And even if the Shares lose value under Defendants' control and are no longer sufficient to repay the Loans, Plaintiff might still pursue a deficiency judgment to satisfy any outstanding debt. *See Concorde Equity II, LLC v. Miller*, No. 10-1041 SC, 2010 WL 2354189, at *3 (N.D. Cal. June 9, 2010) (noting that "monetary injury is not normally considered irreparable" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980))).

Thus, Plaintiff has a high probability of success, but the possibility of irreparable injury to Plaintiff's interest in the Shares is unclear. And because the Court will oversee the receivership, on balance, this factor favors appointing a receiver.

### 7. Receivership's Protection of Plaintiff's Interests

Plaintiff generally asserts its interests "will be greatly served by the appointment of a receiver." (Doc. 15 at 10.) Defendants note the lack of clarity over what interests Plaintiff seeks to protect—whether it be "disposing of the collateral through the receivership, preservation of the collateral, or some other unspecified interest"—and how a receiver would protect those interests. (Doc. 16 at 16.) Rather, Defendant argues the only interest

---

[17] Notably, transfers by inheritance or gift are not subject to the notice requirements. *See* 12 C.F.R. § 225.42(b)(i)–(ii).

- 11 -

advanced by Plaintiff is "the right to ask the court for 'guidance on the best way to dispose of the Shares.'"[18] (*Id.*)

When assessing this factor, courts have found it weighs against appointment of a receiver if denying the plaintiff's request would not impede the plaintiff's ability to continue prosecuting the action. *LPP Mortg. Ltd. v. Ondyn Herschelle*, No. 13-cv-04330-JSC, 2014 WL 3568577, at *4 (N.D. Cal. July 17, 2014); *Avalanche Funding, LLC v. Arif*, No. 2:16-cv-02555-TLN-KJN, 2018 WL 1470597, at *3 (E.D. Cal. Mar. 26, 2018). *But see 8th Wonder Pictures, LLC v. Clear Distrib., LLC*, No. CV 21-726 DSF, 2021 WL 6882316, at *4 (C.D. Cal. Feb. 4, 2021) (finding a plaintiff's interest "would be well-served by a receiver as a receiver would ensure it has the opportunity to recover any collateral for which it contracted"). Here, denying Plaintiff's request would not impede its ability to further prosecute the action or to be awarded the monetary relief it requests. This factor does not weigh in favor of appointing a receiver.

### B. Other Factors

Although the *Canada Life* factors alone may not clearly favor the appointment of a receiver, Plaintiff urges the Court to consider other circumstances: namely, that Plaintiff is entitled to the appointment of a receiver under (1) Arizona law, (2) the Uniform Commercial Code ("UCC"), and (3) the Loan Documents. (Doc. 15 at 6–9.) Defendants do not contest the Court's consideration of these factors.[19] Instead, Defendants cite federal

---

[18] Defendants further argue a receiver would merely "ask the Court for permission to dispose of [the Shares] as he or she sees fit, not for 'guidance' about how to do so." (Doc. 16 at 16.) But a receiver's right to sell the Shares would be wholly subject to this Court's authority, which includes guidance on how the receiver may carry out a sale.

[19] Defendants frame Plaintiff's position to be that the Court should "ignore applicable federal law" and grant the Application based on Arizona's standard. (Doc. 16 at 10.) Plaintiff makes no such argument, merely asking the Court to "consider the Arizona law as a factor that . . . weigh[s] heavily in favor of granting a receivership." (Doc. 15 at 7.) Additionally, Defendants assert that alleged defects in Plaintiff's prior receivership application filed with the Maricopa County Superior Court, as well as in Plaintiff's UCC sale notification, are "indication[s] of how [Plaintiff] is taking liberties with [Defendants'] property both in and out of this Court." (Doc. 16 at 5–8.) But Defendants fail to explain whether and how the Court should consider these assertions in its analysis. *See Can. Life*, 563 F.3d at 844 (directing courts to consider "the probability of fraudulent conduct by the *defendant*" rather than by the plaintiff (emphasis added)). Lastly, Defendants note that Plaintiff is not entitled to appointment of a receiver "merely because the loan agreements provide for one." (Doc. 16 at 10) (quoting *Compass Bank v. Baraka Holdings, LLC*, No. CV 17-06563-AB, 2017 WL 10378348, at *3 (C.D. Cal. Oct. 26, 2017)). Though not

- 12 -

law and regulations requiring a party provide notice to or seek approval from the Board of Governors of the Federal Reserve System before acquiring a controlling share of a bank holding company, arguing that, "[a]t the very least, [this] should weigh heavily against the appointment of a receiver." (Doc. 16 at 8–9.)

### 1. Arizona Law

Plaintiff argues the Court should consider that Arizona law, which the parties agreed to be governed by in the Loan Documents, would likely permit the appointment of a receiver. (Doc. 15 at 6–7.) Additionally, Plaintiff suggests the Court should weigh this factor "heavily in favor of granting a receivership in light of Defendants' decision to remove this case to federal court, which seems to be a clear case of forum shopping." (*Id.* at 7.) Defendants argue Plaintiff's allegation of forum shopping is groundless and that "[t]he Court should reject Plaintiff's suggestion that [the Court] ignore applicable federal law" for appointing receivers.[20] (Doc. 16 at 10.)

The Court must comply with Rule 66 "even in the face of differing state law." *Canada Life*, 563 F.3d at 843 (quoting *Nat'l Partnership Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998)). But the Court also has broad discretion to consider other relevant factors beyond those specifically enumerated by the Ninth Circuit in *Canada Life*. *Id.* at 845. Under Arizona law, before appointing a receiver a court need only find that a party's property or rights therein need protection. A.R.S. § 12-1241; *see, e.g.*, *Gravel Res. of Ariz. v. Hills*, 170 P.3d 282, 285 ¶ 11 (Ariz. Ct. App. 2007).

Here, Section 13.5 of the Loan Agreement contains a forum selection clause in which the parties agreed that Arizona law governs their agreement. (Doc. 1-1 at 92.) The Court agrees that Plaintiff's allegation of forum shopping may be groundless, but it is

---

dispositive, the Court considers the parties' consent to appointing a receiver as a relevant factor. *E.g.*, *Compass Bank*, 2017 WL 10378348, at *3; *N.Y. Life Ins.*, 755 F. Supp. at 292 ("[S]urely the fact that the parties agreed to the appointment of a receiver in the deed of trust is entitled to great weight as the court exercises its discretion[.]"). This is especially relevant here because Defendants—and in particular Mr. Peters, an established and successful businessman—are sophisticated parties who indisputably knew or should have known what they were agreeing to in the Loan Documents.

[20] Nowhere does Plaintiff argue the Court should disregard the federal law governing the appointment of receivers as Defendants suggest.

- 13 -

significant Defendants voluntarily consented to the application of Arizona law. In a contract providing for the appointment of a receiver, specifying Arizona law reflects a conscious recognition by the contracting parties of Arizona's standards for appointing receivers. The parties' agreement to be governed by Arizona's more permissive standard for appointing receivers weighs in favor of appointment.

### 2. UCC

Plaintiff correctly notes under Arizona's version of the UCC, creditors like Plaintiff are "entitled to aid from a court of competent jurisdiction . . . in reaching [a debtor's] certificated security . . . by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process." A.R.S. § 47-8112(E). Because "exercising rights in Shares of stock is inherently difficult," Plaintiff argues "the Court in a diversity action can and should look to Arizona law to assist in the Plaintiff's exercise of its rights in and to the Shares." (Doc. 15 at 7.) This argument provides some support in favor of appointing a receiver.

### 3. Loan Documents

Defendants admit they voluntarily[21] agreed to the appointment of a receiver upon default. Section 5.2(g) of the Security Agreements permits Plaintiff, as one of its available remedies, to "apply to any court having jurisdiction for the appointment of a receiver for the [Shares]." (Doc. 1-1 at 153, 200.) Defendants "expressly consent[ed] to the appointment of such receiver" and, upon appointment, agreed to "immediately . . . surrender possession of the [Shares] to the receiver." (*Id.* at 153–54, 200.)

Though not dispositive, an agreement between parties expressly authorizing the appointment of a receiver is a factor entitled to "great weight" in favor of appointment. *E.g.*, *N.Y. Life Ins.*, 755 F. Supp. at 292; *LPP Mortg. Ltd.*, 2014 WL 3568577, at *3; *HFC Acceptance, LLC v. AEZ Rent A Car LLC*, No. CV 23-7744-GW-AGRX, 2023 WL 11950398, at *3 (C.D. Cal. Nov. 15, 2023); *see Citibank v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) ("It is entirely appropriate for a mortgage holder to seek the

---

[21] At the evidentiary hearing, counsel for Defendants affirmed Defendants are not arguing the receivership provision in the Security Agreements is unconscionable.

appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default."). The Court finds the parties' express consent to the extraordinary remedy of appointing a receiver and immediately surrendering the Shares weighs greatly in favor of appointment.[22]

### 4. Restrictions on Acquiring Control of BHCs

Because CFS is a federally regulated BHC, Defendants note "[t]ransfers of shares in CFS are restricted by 12 U.S.C. § 1842 and, *inter alia*, 12 C.F.R. §§ 225.2, 225.11, and 225.41." Specifically, 12 C.F.R. § 225.41(a) requires 60 days' advance notice to the Board of Governors of the Federal Reserve System ("Board") before acquiring control of a BHC. As Plaintiff seeks to give the receiver custody over approximately 71% of CFS's shares, Defendants argue "[s]uch a transfer or power absent prior approval violates 12 C.F.R. § 225.41"[23] or "at the very least, it should weigh heavily against the appointment of a receiver." (Doc. 16 at 9.)

Under 12 U.S.C. § 1842(a) and 12 C.F.R. § 225.12(b), restrictions requiring prior approval from the Board do not apply to shares acquired by a bank "in the regular course of securing or collecting a debt previously contracted in good faith" so long as the acquiring bank divests the shares within two years. Similarly, 12 C.F.R. § 225.42(b)(1)(iii) exempts from the prior notice requirements any "[a]cquisition of voting securities in satisfaction of a debt previously contracted (DPC) in good faith" so long as the acquirer notifies the appropriate Reserve Bank within 90 days after the acquisition. Defendants do not address these exceptions, offering no explanation why the prior approval and prior notice restrictions should apply to a receiver when Plaintiff's direct acquisition of the Shares

---

[22] Defendants cite *LPP Mortgage Ltd.* as "an analogous case" where the court denied appointment of a receiver despite the parties' consent. (Doc. 22 at 9.) But *LPP Mortgage* is clearly distinguishable, as the agreement there simply "recite[d] that a court may appoint a receiver," rather than "expressly state that the Trustor 'consents' to appointment upon default and without consideration of any other factors." 2014 WL 3568577, at *3. Here, Defendants' consent was express and in no uncertain terms—they agreed to the appointment of a receiver upon default and to immediately surrender the Shares to the receiver.

[23] Defendants appear to conflate the prior notice requirements under 12 C.F.R. § 225.41 with the prior approval requirements under 12 C.F.R. § 225.11.

would be clearly exempted. Thus, the Court gives this factor no weight in its determination.

Overall, the Court finds the *Canada Life* and other equitable factors—particularly the parties' express consent—weigh in favor of the appointment of a receiver.

### IV. PROPOSED RECEIVERSHIP ORDER

The Court finds appointment of a receiver is appropriate as an expeditious and equitable means to resolve the sole issue in this case—selling the collateral (i.e., the Shares) subject to the Court's oversight and approval.[24] Turning to Plaintiff's proposed order governing the receivership, Defendants strongly contest the terms of Plaintiff's proposed order, including concerns regarding the receiver's right to sell the Shares and wield managerial authority over CFS, as well as an alleged lack of relevant expertise of Plaintiff's proposed receiver. (Doc. 16 at 10–11, 12–13, 15–17.) However, Defendants concerns on both points are misplaced and perhaps moot. Defendants have since engaged in efforts to sell CFS and offered a purported expert in BHCs to assist the receiver.

Mr. Corrigan testified he is currently engaged by CFS and is soliciting buyers to negotiate a sale of the entire company. If so, CFS's shareholders—Defendants as well as any nonparty minority shareholders—have seemingly voted or agreed to vote to sell 100% of the company's stock, including the disputed Shares.[25] Plaintiff did not question Mr. Corrigan's expertise in such sales, and Mr. Corrigan is apparently willing to lend his expertise in BHCs to assist Plaintiff's proposed receiver.

Significantly, the parties are to agree on deadlines by which the Shares must be sold and Plaintiff repaid, taking into account all the regulatory notice and approval requirements. If not sold by the deadline, the receiver will proceed with an independent sale of the Shares subject to the Court's oversight and approval.[26]

---

[24] In the hearing, Plaintiffs suggested appointment of a receiver was preferable over a nonjudicial UCC sale. Defendants have already objected to Plaintiff's prior sale attempts over the reasonableness of the proposed bid and the sufficiency of the sale notice. (Doc. 16 at 7–8.)
[25] If true, it appears at odds with Plaintiff's undisputed rights to exercise an approximate 71% interest in CFS's corporate management.
[26] It appears Mr. Corrigan is also retained by Mr. Peters to obtain a separate loan collateralized by the Shares in order to repay Plaintiff. (Doc. 23 at 4.) If so, this may conflict with Mr. Corrigan's duties to CFS to sell 100% of the company.

Plaintiff's Renewed Application for the Appointment of a Receiver, (Doc. 15), will be granted. The parties are ordered to confer and submit a joint proposed order specifying the receiver's powers and duties, as well as deadlines by which the receiver may initiate sale proceedings for the Shares.

Accordingly,

**IT IS ORDERED** Plaintiff's Renewed Application for the Appointment of a Receiver (Doc. 15) is **GRANTED**. MCA Financial Group Ltd., by and through Mr. Morris "Morrie" Aaron, will be appointed as a receiver in this action.

**IT IS FURTHER ORDERED** the parties are to agree upon the receiver's powers and duties with respect to the Shares, as well as to CFS and Century Bank. By **December 2, 2025,** the parties are to file a joint proposed order appointing the receiver and including the governing duties and responsibilities.

Dated this 26th day of November, 2025.

Honorable Roslyn O. Silver
Senior United States District Judge